Elizabeth **BARRETT**, As Administratrix of the Estate of Harold Blauer, Deceased, Plaintiff,

v.

**UNITED STATES of America**, Defendant.

No. 76 Civ. 381 (CBM).

United States District Court, S.D. New York.

May 5, 1987.

Baer Marks & Upham, New York City by Eugene R. Scheiman, Deborah R. Linfield, Richard Kelly, for plaintiff.

Rudolph W. Giuliani, U.S. Atty., New York City, by Beth A. Kaswan, Richard M. Schwartz, for defendant.

## OPINION

MOTLEY, District Judge.

This court is faced with assessing a sad episode in the conduct of the United States Government and a personal tragedy for an unsuspecting victim and his family. The case arises from the death of Harold Blauer, a mental patient who died in 1953 as a guinea pig in an experiment to test potential chemical warfare agents for the United States Army. Rather than admit its role in Blauer's death, the Government covered up its involvement in the affair, thus this opinion is issued today rather than in the early 1950's when the death occurred.

## I. INTRODUCTION

This is a negligence action brought against the United States under the Federal Tort Claims Act, 28 U.S.C. Sections 1346(b), 2671–80. The plaintiff, Elizabeth Barrett, is the daughter of Harold Blauer and brings suit for his wrongful death in her capacity as executrix of Blauer's estate.

Harold Blauer died in 1953 as a result of one in a series of injections of mescaline derivatives he was given at the New York State Psychiatric Institute, a hospital operated by New York State. Blauer's ex-wife brought an action against the State of New York on behalf of the Estate, which she eventually settled. It was disclosed for the first time in 1975 that the Army had supplied the chemicals Blauer received, and that the injections had been made as part of an experiment to develop chemical warfare agents. After this shocking revelation, Elizabeth Barrett, one of Blauer's daughters, instituted three lawsuits during the period from 1976 through 1978 against the United States as well as numerous federal and state employees as individuals.[1]

---

1. The three original actions were *Barrett v. Hoffman,* 76 Civ. 381 (LWP), *Barrett v. United States,* 76 Civ. 1061 (LWP), and *Barrett v. Arthur,* 78 Civ. 3762 (LWP). They were eventually consolidated as the current case, *Barrett v. United States,* 76 Civ. 381 (CBM).

During the ten years over which this litigation has extended, the three cases have been consolidated into one, and various defendants have moved to dismiss on a number of grounds, including failure to state a claim, lack of personal jurisdiction, *res judicata,* statute of limitations, immunity, release, and lack of standing.[2] When the case finally came to trial in October of 1986, only five defendants remained: the United States; General William M. Creasy, former Chief of the Army Chemical Corps; Dr. Amedeo S. Marrazzi, the Chemical Corp's project officer for the contract under which the chemical that killed Blauer was administered; Dr. James P. Cattell, the doctor who injected Blauer with the chemical; and Dr. Newton Bigelow, former New York State Commissioner of Mental Hygiene.

Creasy and Marrazzi were dismissed as defendants for lack of personal jurisdiction on motions made at trial. A jury found that a release signed in 1955 on behalf the Blauer Estate relieved Cattell and Bigelow of liability.

The law requires that an action brought against the United States under the Federal Tort Claims Act be tried by a court without a jury. 28 U.S.C. Sec. 2402; *O'Connor v. United States,* 269 F.2d 578, 585 (2d Cir.1959). This opinion explains the court's decision with respect to the remaining defendant, the United States.

The job of reconstructing events that occurred over 30 years ago was a prodigious one for both the court and the litigants. The facts that emerged at trial are as follows.

## II. FACTS

### A. The Army's Program

In the early 1950's, the United States Army became interested in the use of hal-lucinogenic compounds as potential chemical warfare agents. An internal memorandum of the Army Chemical Center written in 1951 proposed the establishment of contracts to study psychochemical agents on human beings under controlled laboratory conditions, and mentioned the New York State Psychiatric Institute (the "Psychiatric Institute" or "Institute") as a potential contractor. It was expected that under such a contract "new technical data will be derived ... which will provide a firmer basis for the utilization of psychochemical agents both for offensive use as sabotage weapons and for protection against them."

In 1951, the Army Chemical Corps and the Psychiatric Institute (through the New York State Department of Mental Hygiene) entered into contract DA 18–108–CML–2913 ("2913") and contract DA 18–108–CML–2914 ("2914"). Contract 2913 was for the psychological investigation of potential chemical warfare agents, and contract 2914 was for the psychiatric investigation of these agents. As of May 26, 1952, contracts 2913 and 2914 were integrated.

Under the contracts, the Army would supply certain chemical derivatives of mescaline to the Institute for studies on its psychiatric patients. The Institute would report its findings to the Chemical Corps in quarterly reports. The Institute was well-known and respected in the field of psychopharmacology, and in the past had investigated commercially-supplied mescaline sulfate for possible use in its work with mental patients.

Contract 2913 was termed "Effects of Certain CW [Chemical Warfare] Agents on Psychiatric Behavior." The contract, as revised on June 9, 1952, provided that: "The Contractor will conduct studies of Psychochemical agents on human subjects to determine clinical effects on psychologi-

---

**2.** Among the prior published opinions in this case are the following: *Barrett v. United States,* 798 F.2d 565 (2d Cir.1986); *Barrett v. United States,* 689 F.2d 324 (2d Cir.1982); *Barrett v. United States,* 651 F.Supp. 615 (S.D.N.Y.1986); *Barrett v. United States,* 651 F.Supp. 614 (S.D.N.Y.1986); *Barrett v. United States,* 651 F.Supp. 611 (S.D.N.Y.1986); *Barrett v. United States,* 651 F.Supp. 608 (S.D.N.Y.1986); *Barrett v. United States,* 651 F.Supp. 606 (S.D.N.Y.1986); *Barrett v. United States,* 651 F.Supp. 604 (S.D.N.Y.1986); *Barrett v. United States,* 646 F.Supp. 1345 (S.D.N.Y.1986); *Barrett v. United States,* 622 F.Supp. 574 (S.D.N.Y.1985); *Barrett v. United States,* 521 F.Supp. 307 (S.D.N.Y.1981).

cal behavior, including controls on normal human subjects necessary to evaluate the more profound changes expected in the behavior of psychiatrically liable subjects." Contract 2914 had an analogous purpose for psychiatric study. These were the contracts under which the chemical compound that killed Harold Blauer was provided and administered. Much of the text of these contracts was boilerplate of the variety often found in government contracts at the time.

Although the Government retained the right to terminate the contracts at its convenience, overall control of the clinical experimentation was vested in the Psychiatric Institute. The portions of the contracts titled *"Supervision"* stated that the technical phases of the work would be under the supervision and direction of certain Institute doctors. The Psychiatric Institute was responsible for designing its own protocols and procedures to perform the clinical tests of the chemical substances on its patients. This was done by Dr. Paul Hoch, the head of the Institute's experimental psychiatry division. The Army, however, retained responsibility for synthesizing the chemicals, performing animal toxicity tests necessary for determining proper beginning doses for human beings, and supplying the chemicals to the Psychiatric Institute.

At the time the chemicals were synthesized and supplied to the Psychiatric Institute, they were considered classified by the Chemical Corps. For this reason, all information relating to their structure as well as chemical, psychological, and physiological properties was classified. In addition, the Army's program to investigate the military potential of hallucinogens was classified by the Army's Intelligence Division at the level of the Army Chief of Staff, in accordance with Executive Orders and Army implementing regulations. Both Dr. Hoch and Dr. James Cattell, the doctor who physically gave Blauer the injections, had to be given security clearance to perform the experiments.

In November of 1952, the Medical Director of the Army Chemical Corps delivered to Dr. Hoch at the Institute the following five newly-synthesized chemical compounds:

| Code Name | (Chemical Name—"Street Name") |
|---|---|
| EA 1297 | (Methylenedioxyphenyl-ethylamine) |
| EA 1298 | (Methylenedioxyphenyl-isopropylamine—"MDA") |
| EA 1304 | (Methylenedioxyphenyl-isobutylamine) |
| EA 1316 | (Dimethoxyphenyl-isopropylamine—"DMA") |
| EA 1322 | (Dimethoxyphenyl-isobutylamine) |

Three of these chemical derivatives of mescaline were eventually injected into Mr. Blauer as part of the experiments conducted under the contract. EA 1298 was the chemical that killed him.

These chemicals were synthesized by Dr. Amedeo Marrazzi of the Chemical Corps, who was also the project officer for the contracts with the Institute. The compounds were synthesized by making chemical alterations in the "side chains" of the mescaline molecule.[3] A side chain is a molecular structure attached to the main body of a molecule. Chemicals produced in this way from the same molecule are called either homologues or analogues of each other, depending on the extent of difference between their structures. It was well known in the early 1950's that a change in the side chain of a molecule could radically alter the effect of a chemical on the human body. In particular, it was known that changing a side chain could increase the toxicity of a given chemical compound tremendously.

It was known further that it was impossible to predict the effect the alteration of a side chain could have on the toxicity or other qualities of a chemical simply by looking at the change in chemical structure of the molecule on paper. Thus it was necessary to test carefully any newly-synthesized chemical for toxicity before it was administered to human beings.

### B. The Toxicity Studies

Before the Psychiatric Institute began its clinical tests, the Army performed toxicity

---

**3.** Structurally, EA 1298, the chemical that killed Harold Blauer, was a hybrid between mescaline and amphedamine.

tests on the mescaline derivatives, as required by the contract. The generally accepted scientific and medical standards of the time required that such toxicity tests be performed on animals before a chemical substance could be administered to a human being.[4] The purpose of the tests was to determine safe doses to begin experiments with human beings.

The preferred method of establishing safe human doses for a new chemical in the early 1950's was to determine the "LD–50" for the chemical in various species of animals. The LD–50 of a chemical for a particular species is the dose of the chemical that will kill 50% of test subjects of that species to whom the dose is administered (Lethal Dose–50%). Although it has become required practice to determine the LD–50 of a chemical for a number of different species of animals, including some higher animals, before that chemical may be administered to human beings, this practice was not standard in the early 1950's. However, it was known then that test results derived for only one species—particularly a lower species such as mice—were subject to greater error, and that particular care had to be taken in deriving such results if they were to be applied to human beings.

In the early 1950's, the accepted method of deriving an LD–50 of a chemical for a particular species was as follows. Test animals of the same species were divided into groups of at least 5 to 10 animals each. The first step was to find bracketing doses that, when administered to a group of animals, would kill 0% and 100% of them respectively. Next, doses in between these two extremes were chosen in an effort to focus in on the dose that would kill 50% of the test animals. In the early 1950's there was no set number of these mid-range doses that had to be tested; rather, the number depended on how quickly a dose was found that was in the vicinity of the LD–50. After at least one or two doses were found

that were near the 50% level, these data for each test group were placed on a graph with the dose on one axis and the percent of animals killed on the other. A line was then drawn through or "fitted to" these points. The point on the line that corresponded to "50% killed" on one axis corresponded to the estimated LD–50 dose on the other.

After the LD–50 was determined for a particular species, it was divided by the average body weight of the animals tested and typically expressed in terms of milligrams per kilogram (mg/kg) of body weight. In this way, information regarding the LD–50 of one species could be applied, with care, to others. To determine a safe dose to begin experimentation on human beings, it was accepted practice to divide the LD–50 determined in other species by 100.

The Chemical Corps reported LD–50's to the Psychiatric Institute for the derivatives of mescaline it supplied. These included EA 1298, the chemical that killed Harold Blauer. The only LD–50's it determined were for mice, a relatively low species. The Chemical Corps used the following procedure to determine the LD–50 for EA 1298 in mice. First, twenty mice were given a dose of 1.2 mg/kg and none died. Then ten mice were given a dose of 12.5 mg/kg and again none died. Finally, five mice were given a dose of 100 mg/kg and all of them died.

At this point, only the first step of the process was complete: finding the bracketing doses. However, the Chemical Corps did not proceed further. It simply concluded from the data before it that the LD–50 of EA 1298 was between 20 and 80 mg/kg, and reported this plus the test results to the Psychiatric Institute. This procedure was grossly inadequate compared with the scientific and medical standards of the time. The Chemical Corps delivered the compound knowing that the Psychiatric In-

---

**4.** Of course, current standards also require that such tests be performed. In this case, the conduct of the United States must be measured against the standard of what a reasonable person would have done in the early 1950's when

the toxicity tests were performed. Thus, whether specified or not, all references in this opinion to generally accepted standards are to the standards that prevailed when the act in question was performed in the early 1950's.

stitute would not be making further animal toxicity studies before it injected the compounds into human beings in fulfillment of the contract.

The Institute also had toxicity information from a source other than the Chemical Corps. The Institute found that EA 1298 had been synthesized before and that there was a report in the literature about the chemical. This report has been referred to throughout the course of this litigation as the "Gunn Study."[5] The Army did not know that the Institute had the Gunn Study or that anyone else had ever synthesized EA 1298.

Most of the Gunn Study dealt with subjects other than the toxicity of the chemicals. However, the article did report minimum lethal doses (MLD's) for each of the compounds, including EA 1298. The MLD was the lowest dose at which it was found that any animal died from administration. In the early 1950's the MLD, as it was presented in the Gunn Study, was known not to be a reliable basis for determining doses for human beings, but such information could be useful to a trained scientist in conjunction with other information.

However, the Army's LD–50 study was of such little use that, even when supplemented by the Gunn Study, it did not provide sufficient information on which to base safe doses for human beings. Not even someone of Dr. Hoch's experience and expertise could have safely determined human doses using only the information contained in the Army's LD–50 study and the Gunn Study.

After Blauer's death, the Army asked the University of Michigan to do LD–50 studies on several of the mescaline derivatives it had provided to the Psychiatric Institute, including EA 1298. These tests were performed properly, according to the scientific and medical standards of the time. The University performed the tests on mice, rats, guinea pigs, dogs, and monkeys. The reported LD–50's of EA 1298 for these animals were as follows:

| Species | mg/kg | Method of Administration |
| --- | --- | --- |
| Mouse | 57.7 | intraperitoneal |
| Rat | 33.1 | intraperitoneal |
| Guinea Pig | 33.7 | intraperitoneal |
| Dog | 6.8 | intravenous |
| Monkey | 9.0 | intravenous |

An LD–50 that is determined through intraperitoneal administration is much higher than one determined for the same species through intravenous administration. Therefore, it is not medically sound to use an intraperitoneal LD–50 to determine safe intravenous doses unless some correction is made for this fact.

In addition to the above data, the Michigan study showed that the LD–50 for EA 1298 is several times lower than the LD–50 of the other mescaline derivatives used in the experiment, meaning it is considerably more toxic. The study also reported that EA 1298 caused such symptoms in animal subjects as tremors and tonic extensor and clonic convulsions before death. These symptoms were similar to the physical symptoms Harold Blauer experienced before his death.

## C. Harold Blauer's Treatment at the Institute

Harold Blauer was admitted voluntarily to the New York State Psychiatric Institute on December 5, 1952, suffering from severe depression after a divorce. From October to December, 1952, he had been a patient at Roosevelt and Bellevue Hospitals. Shortly after Blauer was admitted to the Institute, he was diagnosed as a pseudo-neurotic schizophrenic. He was assigned to the care of Dr. George Schnack, a psychiatric resident who treated him with talk therapy. Blauer improved substantially under Dr. Schnack's care, and when Blauer died, he was scheduled to be released in a matter of weeks.

In addition to this talk therapy, Blauer was used as a subject in the chemical studies the Institute performed under contract with the Army's Chemical Corps. The chemical injections Blauer received during

5. Gunn, Gurd, and Sachs, *The Action of Some Amines Related to Adrenaline: Nethoxy-Phenyli-* *sopropylamines*, 95 J. Physiol. 485 (1932).

these experiments were not for his diagnosis or therapy. Although, there is evidence that in the early 1950's there was some hope that mescaline, and perhaps its derivatives, might one day be developed as a diagnostic or therapeutic tool for working with the mentally ill,[6] there is no doubt that the injections Blauer received were not intended to serve any diagnostic or therapeutic purposes for him, personally.

The sole purpose of the injections was experimental. The primary purpose of the experiment was to gather the data the Chemical Corps required for its investigation of the mescaline derivatives as potential chemical warfare agents. The doctors at the Institute might also have been interested in the results of the experiments to further their own scientific knowlege of how the mind works, and perhaps had some long-run hope that the chemicals might prove to be a useful tool in the treatment of mental patients.

However, the lack of communication between those conducting the experiment and those conducting Blauer's therapy and diagnosis shows that no diagnostic or therapeutic purpose for Blauer, himself, was ever intended from the injections. This is also clear from the fact that Blauer was given widely varying doses of three different chemicals. In addition, it is implausible that the injections were given for Blauer's diagnosis, since he was to be released from the Institute not long after the fifth injection was given.

Blauer was competent to give consent to the experiment. He never gave written consent to participate in the experiment, but written consent was not required in the early 1950's. Oral consent was, however, required, and a patient had the right to withdraw at any time from an experiment to which he had previously consented.

Blauer was aware that the drugs he was given were "experimental" in the sense that they did not come off the shelf from a pharmacy. However, he was unaware that they were not being administered to help him; that is, that the purpose of the injections was purely experimental. He certainly had no idea that he was being used in an experiment to develop chemical warfare agents.

Dr. Paul Hoch of the Institute designed the protocols for the chemical studies using the toxicity data supplied by the Army plus the Gunn Study. Dr. James Cattell, the senior research scientist at the Institute, gave Blauer the following chemical injections according to these protocols:

| Date | Chemical | Total Dose (mg.) | Mg/Kg of Body Weight |
|---|---|---|---|
| 12/11/52 | EA 1298 | 28.4 | 0.4 |
| 12/18/52 | EA 1316 | 69.5 | 1.0 |
| 12/23/52 | EA 1297 | 347.5 | 5.0 |
| 12/30/52 | EA 1316 | 695.0 | 10.0 |
| 1/8/53 | EA 1298 | 450.0 | 6.47 |

Immediately before the first injection of EA 1298, Dr. Cattell's study notes indicate that Blauer was "[v]ery apprehensive" about taking part in the study and that "considerable persuasion [was] required" to make him accept the injection. The chemical caused a feeling of pressure in his head and a slight tremor in his right leg.

Immediately before the second injection, the study notes again indicate that Blauer was "apprehensive" about taking part. There was little or no physical reaction to this chemical.

Before the third injection, the nurses observed that Blauer was more disturbed about having the experiments continue. He asked one of them if she would call the "drug study" floor and tell them that he had a cold because the doctors would never believe him if he told them. Nevertheless, Blauer was given the third injection. The chemical caused him to shake all over.

Before the fourth injection, Blauer stated clearly to his therapist, Dr. Schnack, that he did not want to continue with the injections. He was told, however, that if he did not continue he would have to leave the

6. The scientists involved with the mescaline experiments at the Psychiatric Institute had concluded that mescaline had no "diagnostic, prognostic, or therapeutic" use for the treatment of mental patients, although clearly at one time they had hoped it might. *See* Government Exhibit 172, Hoch, Cattell, and Pennes, *Effects of Mescaline and Lysergic Acid (d-LSD–25)*, 108 Amer.J.Psych. 579, 583 (1952).

Psychiatric Institute and return to Bellevue or Roosevelt Hospital, where he had been miserable before. He therefore did not pursue his complaints further. The fourth injection caused a violent reaction. He had body tremors and repeatedly sat up and flopped back down.

The protocol Dr. Hoch had designed called for the injection of 450 mg of EA 1298 as the fifth injection. This was sixteen times Blauer's only other dose of EA 1298, which had been administered as his first injection. It was not scientifically or medically sound to base the dose of one chemical on a patient's reaction to an analogue or homologue of that chemical, such as the mescaline derivatives Blauer had been given in his second, third, and fourth injections. This was known in the early 1950's.

Before Blauer's final injection, he complained about the injections often to both his therapist and the nurses. Nevertheless, on January 8, 1953 between 9:53 and 9:57 a.m., Blauer was injected with 450 mg, or 6.47 mg/kg of body weight, of EA 1298. According to the drug study notes, at 9:57 Blauer became very restless and had to be restrained by the nurse. He began sweating profusely and flailing his arms wildly. At 10:01 he "pulled up in bed," his body stiffened, his teeth clenched, and he began frothing at the mouth. Similar reactions continued for over an hour. Blauer was still talking and moving his legs randomly at 11:05. Finally, about one and one-half hours after the injection had begun, Blauer lapsed into a coma. He was pronounced dead at 12:15 p.m.

At approximately the same time that Blauer received his injection of EA 1298, another patient was given the same chemical. It was known in the early 1950's that the prudent course of conduct was to give injections of relatively untested chemicals such as EA 1298 serially rather than concurrently; that is, to give an injection to one patient and analyze the result before giving an injection of the same chemical to another.

The other patient's reaction to EA 1298 was similar to Blauer's. However, it was so violent that the injection was stopped when it was only about one-third complete. After the patient recovered, she said, "I've been in hell. Why did they put me in hell?" She added, "They were supposed to make me feel good. I've never felt this bad before; I feel terrible."

## D. Events After Blauer's Death

The Psychiatric Institute informed the New York City Medical Examiner (the "Medical Examiner") of Blauer's death on the day it occurred. On January 9, 1953, the day after Blauer died, Dr. Cattell submitted a written report to the Medical Examiner that explained the death as follows:

> The patient received an intravenous injection of a mescaline derivative at 9:53 a.m. on January 8, 1953 for diagnostic purposes. He had received this drug previously with no untoward reaction. A few minutes after the injection the patient became unconscious, showed a tonic rigidity of neck and arms and legs, became cyanotic, pulse became thready and blood pressure dropped to 110/40. He was given intravenous glucose and coramine and nasal oxygen and he showed a marked improvement. He started to speak and appeared to be on the way to recovery. Then he suddenly became pulseless, blood pressure dropped, respiration ceased and he expired. He was pronounced dead at 12:15 p.m.

There was no mention that the "drug" had been administered as part of a chemical study, and, in fact, the report was misleading in that it indicated that the injection was given for diagnostic purposes.

The Medical Examiner's autopsy report listed the cause of Blauer's death as "coronary arteriosclerosis, Sudden death after intravenous injection of a mescaline derivative, January 8th 1953."

On the morning of January 9, Dr. Hoch of the Institute informed the Chemical Corps of Blauer's death. Army doctors had several conversations that day to discuss the Army's response. The Army immediately began to take actions to make sure that its involvement with Blauer's death did not come to light. It was made

clear to Dr. Hoch that the Army's involvement was to be hidden. It was agreed that the Medical Examiner could have a sample of the chemical, which he was eventually given, but only on the condition that its source not be revealed.

At the request of a Col. Bayliss, Dr. Amedeo Marrazzi, the Chemical Corp's project officer for the contract under which the experiments had been performed, travelled to the Psychiatric Institute on January 10. At the Institute, Marrazzi spoke with Dr. Hoch and Dr. Cattell to learn how Blauer had died, and obtained from them records of the injections. He instructed them not to continue the experiments until certain safety measures were implemented. However, he also noted in his trip report that the results of the experiments obtained thus far were very useful for the Army's purposes, that he recommended continuation of the experiments, and that $120,000 had been transferred to the Chemical Corps for this purpose.

In addition, Marrazzi indicated in his trip report that while he was in New York he "prevailed on one of the New York City medical examiners with whom he was well acquainted to place all the records [regarding Blauer] in a confidential file in the medical examiner's office." Thus the Medical Examiner was informed that Blauer's death was connected with secret Army experiments, but he was also told that this information was not to be disclosed.

Dr. Schnack, Blauer's treating physician was not informed of his patient's death until he attempted to obtain Blauer's record from a nurse to continue the treatment. When he learned of Blauer's death, Schnack attempted to find out more about how Blauer had died, but he was told in no uncertain terms that he was to stay out of the matter and that others would be taking care of the case from that point on. Schnack was rebuffed several times when he attempted to obtain Blauer's record to make his closing entries. He remembers being frustrated by his inability to gain information. When he was finally given Blauer's file, it was considerably smaller and thinner than normal, indicating that portions were missing.

The Psychiatric Institute informed Blauer's ex-wife, Amy Blauer, of the death on the day it occurred. She was told that Blauer had died of an overdose of a drug. She was not told that he had been a subject in a chemical experiment or that the injection was not given for Blauer's own good. She certainly was never told that Blauer had died in an experiment to develop chemical warfare agents for the United States Army.

As soon as Amy Blauer learned of her ex-husband's death, she contacted the law firm of Kaye, Scholer, Fierman & Hayes ("Kaye Scholer"), which immediately began to investigate the possibility of a lawsuit. Harold Fierman, a partner at the firm, was Amy Blauer's uncle.

On January 22, 1953 and January 28, 1953, Kaye Scholer wrote to the Institute on behalf of Mrs. Blauer requesting information on Blauer's death. Complete and accurate information was not forthcoming. The firm was never told that Blauer died in an experiment, and was never given any of the documents regarding Blauer—such as the drug study notes or contract documents—that would have led Kaye Scholer to suspect the Army's involvement, or, indeed, to suspect that there was anything at all unusual about Blauer's death. On the contrary, the law firm was consistently led to believe that Blauer had died from an atypical reaction to a drug administered for his diagnosis and therapy.

Charles Cohen, then a young associate with Kaye Scholer, went to the Psychiatric Institute to gather information. While there, he was allowed to read and take notes on some of Blauer's hospital records. Of course, he was not permitted to see any of the drug study records that might have led him to suspect the Army's involvement.

To aid in its investigation, Kaye Scholer contacted Dr. Louis Winkelman for expert medical advice. Winkelman told Kaye Scholer that a mescaline derivative is "a product of mescaline probably produced by one of the drug companies, with something added to or removed from the mescaline in

an attempt to decrease the toxic effect." Dr. Winkelman suggested that the mescaline derivative might have been given to Blauer in connection with electric shock therapy to lessen the accompanying spacisity.

When given details of the Medical Examiner's autopsy report, Winkelman concluded that it "would seem that [Blauer] was particularly sensitive to this drug and that the death appeared to be an accidental one." These were reasonable conclusions to draw given the misleading nature of the Medical Examiner's report and the other documents available to Kaye Scholer. Winkelman also suggested that Kaye Scholer check the Psychiatric Institute's records to see whether the mescaline derivative had previously been given and what effect it had had. This was never done.

On April 2, 1953, Kaye Scholer, on behalf of Amy Blauer and the Blauer Estate, filed complaints in the New York Court of Claims against the State of New York, alleging that Blauer's death was caused by the Institute's negligence in injecting him with an overdose of a toxic and dangerous compound. Mr. David Marcus, then Assistant Attorney General of the State of New York, was assigned to defend the case.

Communications between Amy Blauer and Kaye Scholer were slowed by the fact that she moved to Mexico soon after the litigation began. She was a somewhat uncooperative client, in that she often did not respond to her lawyers' letters promptly. However, her presence in New York was not essential to the progress of the litigation. The State of New York never obtained a notice of deposition or a court order for examination of Amy Blauer before trial.

By motion dated December 10, 1953, the Estate sought the right to examine Institute personnel under oath and to inspect "all documents, correspondence, records and writings in any way affecting," *inter alia,* the "injections given to said Harold Blauer and the effect thereof upon him." On January 4, 1954, the Court of Claims granted the motion and authorized production of the Institute's records bearing on the treatment of Mr. Blauer and the examination of the doctors involved, which was scheduled for January 12, 1954.

The Estate eventually did receive some of the Institute's records of Blauer's treatment. However, it was never given any documents that in any way indicated the Army's involvement, although a number of such documents clearly fell within the scope of the production order. The plaintiff was never told that documents could not be produced because they were classified. Rather, the fact of their existence was simply never disclosed. The plaintiff was aware, however, that its document request was never full complied with.

From the documents to which the firm was eventually given access, a careful reader could have concluded that Blauer had died as a result of the injection of a mescaline derivative and that this "drug" was in some sense "experimental." However the records also contained several inaccurate and misleading statements, some added at the time of Mr. Blauer's death or afterwards. They indicated that Blauer was given the chemical for "diagnostic and therapeutic purposes," when in fact the purpose was purely experimental. They also stated that Blauer's reaction to the drug was "atypical," when, in fact the chemical was newly-synthesized, and thus no reaction could be "atypical." Finally, they made it appear that Blauer's death, while triggered by the injection, was really caused by a weak heart.

Assistant Attorney General David Marcus learned of the Army's involvement with Blauer's death for the first time when be began to prepare his witnesses for trial and was told they would not be able to answer a number of questions because of security classification. He agreed to join in the effort to keep the Army's involvement secret. Marcus sought to postpone the examination of witnesses before trial on several occasions at the direction of the Army. This was accomplished through mutual agreement with the plaintiff, and these depositions never occurred.

The primary reason the Army covered up its involvement was to avoid "embarass-

ment and adverse publicity" that would result from disclosure that the Government was testing potential chemical warfare agents on unsuspecting citizens. In particular, the Chemical Corps was concerned that it would be difficult to place similar contracts for chemical studies in the future if the public were to become aware of such experiments.

Although concern about the release of classified information was also a factor in the Army's desire to keep its role in Blauer's death secret, the classified nature of the material was generally referred to in Army memoranda and meetings on the subject more as a means of keeping the Army's secret than a reason, in itself, for keeping the secret.

The State of New York also feared adverse publicity if it were to become known that the New York State Psychiatric Institute had performed chemical warfare experiments on its patients. This gave the State incentive to cooperate with the United States in the cover-up.

The Government soon decided on the strategy of having David Marcus pressure the Estate to settle its claim quickly, while at the same time making sure that the Estate never had reason to suspect that Blauer's case involved anything but garden-variety hospital malpractice, if that. In January of 1954, the Assistant Chief of Staff of the Army's Intelligence Division verbally agreed to pay one-third of an out-of-court settlement in the Court of Claims action if the Army's role were not disclosed.

In addition, at the Army's request, Marcus discussed with Dr. Newton Bigelow, the New York State Commissioner of Mental Hygiene, ways to bypass the submission of the case to the Court of Claims to avoid disclosure of the Army's involvement.

Efforts to keep sensitive documents out of the hands of the Estate continued. At the end of June, 1954, Col. Nathaniel Rieger of the Department of the Army, Office of the Judge Advocate General, requested from Mr. John Vogel, an attorney with the Chemical Corps, that all documents in the possession of the Institute, classified *or*

unclassified, pertaining to the contracts for experimenting with EA 1298 be taken out of the State of New York and returned to the Army Chemical Center in Maryland. On July 28, Lt. Col. Harris North of the Judge Advocate General's Office (JAG) advised Lt. Col. Herbert Greer, Legal Advisor to the Chief Chemical Officer of the Chemical Corps, that JAG believed "it would be mutually advantageous to the United States and the State of New York if the [Psychiatric Institute] voluntarily placed this contract [for experiments on EA 1298] ... and any other contract records which in any way describe this as a contract for testing chemical warfare agents on human subjects, in the possession of the Chemical Corps Procurement Agency, Army Chemical Center, Maryland, at least during the pendency of the subject litigation. There they would be beyond the subpoena power of the plaintiff in [the Court of Claims] action."

Some time in 1954, all documents in the Institute's possession relating to EA 1298, both classified and unclassified, were moved to the Army Chemical Center with the exception of the contract document itself. In 1975, some twenty years later, these and other documents were discovered in the safe of Dr. Van Sim of the Edgewood Arsenal in Maryland, with instructions not to open them without his authorization.

When Dr. Hoch requested that some of his files be returned, the Army determined to "stall" him until after the litigation was settled, to assure that such documents would not be given to Blauer's estate.

On June 30, 1954, Blauer's case was brought to the attention of the Department of Justice. A conference was held at the Department to discuss the case on July 6, 1954. In attendance were Dr. Hoch of the Psychiatric Institute, doctors from the Chemical Corps, and lawyers from the Justice Department and the Judge Advocate General's Office. After considerable comment by all the parties at the conference, it was concluded that:

1. Immediate action would be taken to declassify the security category of the chemical EA 1298.

2. The Department of the Army would explore the availability of funds to settle the Court of Claims litigation.

3. Further research would be done to determine whether any scientific literature had been published on the chemical compound administered to Blauer.

4. If it became necessary to reveal the source of the drug at trial, Dr. Hoch should identify the Army Medical Corps as the supplier. (The Army Chemical Corps performs many functions for the Army Medical Corps.)

After this conference, the Army declassified the chemical name of EA 1298, its formula, its psychological and psychiatric properties, and its "diagnostic uses." The Government did this so that witnesses called in connection with the litigation could avoid the necessity of claiming privilege if asked some preliminary questions about the chemical given to Blauer. Of course, claiming a privilege because of classification would have alerted the Estate immediately that there was much more to Blauer's case than it had been led to believe. The purpose of the contract with the Institute remained classified.

On July 12, 1954, a second larger conference was held at the Department of Justice with many of the same participants as the first in attendance, plus a few additions. Much of the discussion was directed by George S. Leonard, a lawyer in the Civil Division of the Department of Justice. Leonard stated that if it became necessary at trial, the Estate could be told that the source of the chemical was an Army Medical Officer of the Army Medical Authority or the Army Chemical Center Medical Laboratory. He specified, however, that if the source of the compound had to be revealed, it should be attributed to the Army Medical Corps, not to the Chemical Corps.

Leonard also stated that the nature and purpose of the contract between the Institute and the Army were not to be revealed. He justified this by asserting that the purpose of the contract was not legally relevant. However, it was clear that the court was not to be allowed to decide what was and was not legally relevant. These facts were simply to be concealed. In addition, Leonard noted that, in his opinion, the Estate's case would be worth between $60,000 and $75,000 "in the event the full attendant circumstances were revealed to the court," and that the case should be settled to prevent the truth from coming to light.

In concluding the conference, Leonard "forcibly informed Mr. Marcus that the pretrial procedures and any further proceedings should be limited to the medical aspects of the case." He reiterated that, if necessary, the source of the drug could be identified as the Army Medical Corps. However, he emphasized that revealing the relationship between the Government and the Institute, the purpose of the contract, or the results of the experiments would be objectionable.

Dr. Hoch also spoke at the conference. He admitted that he might have deviated from accepted medical practice in the treatment of Mr. Blauer. He also refused to state that he would have used EA 1298 in the absence of the contract with the Chemical Corps.

In response to requests made at the conferences, two Justice Department lawyers wrote a memorandum in which they detailed ways to limit the areas on which the Blauer litigation would touch. The memorandum also detailed considerations that should "shape the answers" of any of the doctors called to testify. The memorandum suggested that the doctors state that mescaline derivatives had been coming into general use for the diagnosis and therapy of mental patients. It strongly discouraged any mention of the animal toxicity tests or the experimental nature of the injections, since, according to this memorandum, "we have been advised that neither the patient nor his family were advised of the proposed therapy or gave permission."

Marcus began pressuring the Estate to settle its claim early in 1954, in accordance with the United States' wishes and his per-

ception of the best interests of the State of New York. He took a tough bargaining position, claiming that the State had not been negligent and that Blauer had died of a heart attack rather than the injection. He said, however, that New York State would be willing to settle the case to avoid the expense and adverse publicity of a trial.

The United States agreed to contribute one-half of any reasonable settlement reached. This was on the condition that both the contribution and the Army's role in Blauer's death be kept secret, and that the release signed would cover the supplier of the drug and thus the United States. Since the Chemical Corps did not have funds to contribute to the settlement, it was arranged through the Army Intelligence Division that intelligence contingency funds be made available for this purpose.

Mr. Marcus and Kaye Scholer negotiated a settlement of $15,000. By letter dated April 27, 1955, then Assistant Attorney General of the United States Warren E. Burger informed Marcus that a payment in the amount of $7,500 to the State of New York would be made as soon as the administrative arrangements for issuing a check for that amount were completed.

Amy Blauer returned from Mexico and replaced Kaye Scholer with the firm of O'Dwyer & Bernstein. She did this largely because of personal differences she had with her uncle at Kaye Scholer. A stipulation of substitution was filed in June of 1954. O'Dwyer and Bernstein did little, if anything, to develop further the facts regarding Blauer's death. The firm did, however, continue the settlement proceedings in Kaye Scholer's place.

New York law required that the settlement of any claim against the State be approved by a judge of the New York Court of Claims, and that a *prima facie* showing that the State was negligent be made before the Court. The Court of Claims judge handling the Blauer case refused to approve the $15,000 settlement figure. Marcus telephoned the Judge Advocate General's Office with this information. He said he believed the judge would

agree to an $18,000 settlement. On May 16, 1955, the Judge Advocate General assured Marcus that the Government would contribute $9,000 of that figure. The Estate ultimately accepted the $18,000 settlement.

The Court of Claims proceeding to approve the settlement was held on May 17, 1955. Amy Blauer and Dr. Hoch both testified at the hearing. Only Mr. Marcus examined Hoch, who testified to matters relating to the State's liability. The Estate's attorney, Anthony Sacco, declined to examine Hoch, since the purpose of the proceeding was simply to approve a settlement already negotiated between the parties and to satisfy the requirements of State law.

Hoch testified that Blauer's injections were not given according to the generally accepted medical practices of the time. Parts of Hoch's testimony were false and misleading. He testified repeatedly that the injections Blauer was given were a regular part of his diagnosis and therapy. He also implied that the substances given Blauer were commonly used for such purposes and that they were not "new" drugs. This testimony was consistent with the strategy the Government lawyers had discussed with Hoch earlier and with their desire to limit the scope of the trial so that the Chemical Corps' involvement in Blauer's death would not come to light.

During Hoch's testimony, Marcus handed documents he identified as Blauer's medical record at the Psychiatric Institute directly to the Claims Court Judge to be impounded and then returned to Marcus after the proceeding. Sacco was not permitted to see these documents. However, Sacco made it clear that he was reserving his right to see the records if the need should arise. The judge responded that he did not see why Sacco should see the records if the case was about to be settled, and Sacco agreed.

Amy Blauer also gave some testimony at the hearing to allow the court to conclude that the settlement figure was reasonable. However, the court never performed a traditional determination of damages under

New York's wrongful death statute, nor did it attempt to do so. Rather, it simply accepted the $18,000 settlement figure to which the parties had agreed earlier.

Amy Blauer also testified that, as part of the settlement, she understood that she was relinquishing the Estate's claims against, *inter alia,* the supplier of the drug injected into her ex-husband. On the day of the hearing, she signed a release releasing the "... organization, group, governmental body or agency which furnished the drug."

The court issued findings of fact and conclusions of law that stated that Blauer had died as a result of New York State's negligence and that damages of $18,000 should be awarded to the Estate.

Marcus forwarded the executed release by letter dated May 20, 1955 to George Leonard at the Department of Justice and requested a check for $9,000. Assistant Attorney General Burger forwarded the letter to the Judge Advocate General's Office. The Judge Advocate General responded by letter informing the Attorney General of the United States, Herbert Brownell, that the release was satisfactory and enclosing a check for $9,000. Burger then forwarded the check to Marcus. The judgment in the amount of $18,000 was entered on July 7, 1955 on behalf of Amy Blauer as administratrix of the Estate. The judgment was satisfied by a check from New York State for that amount on December 2, 1955.

Neither Amy Blauer nor the Estate's attorneys learned that the United States had paid half of the settlement until 1975. They were kept totally in the dark about every aspect of the Army's involvement in Blauer's death. Amy Blauer died in 1974. On August 12, 1975, representatives of the Secretary of the Army contacted Blauer's two daughters and issued a press release disclosing for the first time that the Army had been involved in Blauer's death.

In September of 1975, Elizabeth Barrett, Blauer's eldest daughter, filed an administrative claim for $8,500,000 with the Department of the Army for the wrongful death of her father. On or about October 27, 1975, Barrett applied to the New York Court of Claims for pre-suit discovery to learn the facts surrounding her father's death. On January 9, 1976, the Court of Claims denied without prejudice Barrett's application on grounds that the 1955 judgment precluded Barrett from instituting another lawsuit against the State of New York. *See Barrett v. State of New York,* 85 Misc.2d 456, 378 N.Y.S.2d 946 (Ct.Cl. 1976).

Barrett then filed the actions that gave rise to this lawsuit in federal court in 1976 and 1978.

## III. DISCUSSION

### A. Affirmative Defenses

The United States asserts three affirmative defenses to this action. These are (1) that the action is barred by the statute of limitations, (2) that the release signed by Amy Blauer in 1955 relieved the Government of liability, and (3) that the Court of Claims' finding in 1955 that damages to Harold Blauer's Estate amounted to $18,000 precludes the Estate from claiming higher damages in this action. It is necessary to discuss these affirmative defenses before reaching the substance of plaintiff's claim.

### 1. Statute of Limitations

The Federal Tort Claims Act provides that "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues." 28 U.S.C. Sec. 2401(b). The general rule under the Act is that a tort claim accrues at the time of the plaintiff's injury. *United States v. Kubrick,* 444 U.S. 111, 120, 100 S.Ct. 352, 358, 62 L.Ed.2d 259, 268 (1979). If plaintiff's claim accrued under the Act when Blauer died in 1953, then this action is barred.

However, under certain conditions, accrual may not occur until the plaintiff has, or with reasonable diligence would have, discovered the critical facts of both his or her injury and its cause. *Id.; Barrett v. United States,* 689 F.2d 324, 327 (2d Cir.1982),

*cert. denied,* 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983). Thus, "[r]ead into every federal statute of limitations ... is the equitable doctrine that in case of defendant's fraud or deliberate concealment of material facts relating to his wrongdoing, time does not begin to run until plaintiff discovers, or by reasonable diligence could have discovered, the basis of the lawsuit." *Barrett* 689 F.2d at 327 (*quoting Fitzgerald v. Seamans,* 553 F.2d 220, 228 (D.C.Cir.1977)).

This court has the benefit of the teachings of the Second Circuit on this issue contained in one of the two prior Circuit Court decisions in this case, *See Barrett v. United States,* 689 F.2d at 327–30 [hereinafter *Barrett I*]. In *Barrett I,* the Second Circuit reversed a district court decision dismissing plaintiff's claims as barred by the statute of limitations. The Court held that application of the diligence-discovery accrual standard would be triggered if it were proven at trial that the Government had deliberately concealed the material facts related to its wrongdoing. *Id.* at 328.

*Barrett I* identified certain of plaintiff's allegations that, if proven, would trigger application of the diligence-discovery rule. These allegations bear repeating:

> [I]nternal agency memoranda indicate that even after the Army agreed to declassify (from the previously "Secret" category) the nature of the drug which killed Blauer it insisted that, if revealed, the source of the drug should be identified as the Army Medical Corps rather than the Army Chemical Corps. In addition, the warfare research purpose for developing the compound and for administering it to Blauer was to remain classified defense information. Thus, there would only remain the deliberate false impression that the drug used on Blauer was administered for therapeutic purposes. When Blauer's estate brought a tort action in the New York State Court of Claims in 1953, Marcus, the Assistant Attorney General of New York responsible for defense of the suit, was "forcibly informed" that the legal proceedings should be limited to the "medical aspects" of the case; he was urged to postpone indefinitely the previously scheduled depositions of Institute doctors because, "due to security classification," they "would probably not be able to answer the questions which would be propounded." Marcus was further informed that nobody would be permitted to testify or disclose information "under threat of prosecution under the Espionage Act." The Army repeatedly urged that certain Institute documents connecting the Government with these events be turned over to the Army while litigation was pending so that, according to an Army memorandum, they could be placed "beyond the subpoena power of the plaintiff." Finally, when the suit was settled for $18,000 in 1955 the Government agreed to pay half of the settlement on the condition that its role and purpose for supplying the drug would be kept secret.

*Barrett I* at 328.

■ Plaintiff has successfully proven each of these allegations and more at trial. Thus, the diligence-discovery rule is properly applied in this case, and the cause of action must be held to have accrued when the Estate should have discovered the critical facts of Blauer's injury and its cause. *Id.* Since the injury was known immediately, the crucial question is when the Estate should have discovered the critical facts relating to the cause of death. *Id.*

When Blauer's estate brought suit against the State of New York in 1955, it knew or could have known through a reasonable investigation only of a garden-variety medical malpractice case. The Estate was misled from the moment Amy Blauer was informed of her husband's death into believed that her husband died because of an atypical reaction to a drug administered for his diagnosis and therapy. A conspiracy soon developed to make sure that the Estate accepted this convenient picture of the death. The United States and the State of New York plotted the coverup because of their concern about adverse publicity, and the doctors at the Psychiatric Institute were happy to go along because of their

concern about their professional reputations.

In contrast to this false picture of the nature of Blauer's injury, the true gravamen of the Estate's claim is that Blauer was given an injection entirely for experimental purposes and not for his own benefit. That is, "the real reason Blauer died was not medical incompetence in the administration of a therapeutic or diagnostic drug, but the fact that he was used as a human guinea pig." *Barrett I* at 329. In addition, as the Second Circuit pointed out in *Barrett I*, "not only was the 'what' element of the causation inquiry unknown to the plaintiff until 1975, but the 'who' element was also missing from the puzzle." *Barrett I* at 330. The Government concealed totally its involvement with Blauer's death. "It is illogical to require a party to sue the Government for negligence at a time when the Government's responsibility in the matter is suppressed in a manner designed to prevent the party, even with reasonable effort, from finding out about it." *Id.*

After Blauer died, the United States and those acting at its direction went about removing any "red flags" that might have led the Estate even to imagine such a scenario. The people from whom a plaintiff would normally expect to hear of unusual circumstances surrounding a death were either kept ignorant of the facts by the Army's actions or incorporated as accomplices in the Government's cover-up. The Government's job was made easier by the fact that information about the true nature of Blauer's death was already limited to two doctors at the Institute because the project was classified.

For example, Blauer's treating physician, Dr. Schnack, was told that he was to keep out of the Blauer matter so that he would not accidently expose the Chemical Corps' involvement. The New York Medical Examiner was told of the Army's involvement but was also told that this involvement could not be disclosed to the Estate or to anyone else. The Estate was given access only to incomplete and partially inaccurate medical records that corroborated the story that Blauer had died of an overdose of a drug administered for diagnostic and therapeutic purposes and contained no hint of the Chemical Corps' role. The medical expert that the Estate hired to assess these records reasonably concluded from them that Blauer's death was accidental and in no way unusual.

If the Estate had asked about the source of the chemical at the 1955 trial, it would have been told that it was supplied by "Army doctors" or by "the Army Medical Corps." This answer also would have lulled the Estate into not searching beyond the simple story that Blauer had died from an overdose of a drug administered for his diagnosis and therapy. Finally, Dr. Hoch gave false and misleading testimony at the 1955 hearing to reinforce the false image of Blauer's death that the United States wished the Estate to accept.

While the Estate was being misled about Blauer's death, Marcus was pressuring it to settle for what seemed to be a substantial sum, given the uncertain nature of the claim as the Estate understood it. It is also necessary to note—as the defendants in this case reminded the court and jury often at trial—that the events involved in this case occurred at a time when people trusted their government and other institutions in a way that may seem almost naive today.

Given the way that the United States sanitized the Estate's view of the events leading to Blauer's death, plaintiff was duly diligent in attempting to discover the critical facts, or the "what" element, of its claim. It sent Mr. Cohen to the Psychiatric Institute to investigate Blauer's death. It at one point or another examined what it thought were the major documents in Blauer's medical record. It also obtained the Medical Examiner's report on Blauer's death. It related the information it had gained to a medical expert, and the expert reasonably advised the Estate that Blauer's death appeared to have been a simple accident. When faced with this sanitized record and what seemed to be a fair, if not generous, settlement offer from the State, it was reasonable for the Estate to settle

its case without further investigation. While the law requires that plaintiff have been reasonably diligent in pursuing its claim, it does not require that plaintiff have gone chasing after shadows.

The court, therefore, concludes that the plaintiff could not have discovered the critical facts surrounding the cause of Blauer's death through reasonable diligence until the Army's involvement was revealed in 1975. The United States' successful efforts to cover up these facts removed from the Estate's path any evidence that might have led it to become suspicious, and the extent of its investigation was reasonable under these circumstances.[7]

*2. Release*

In 1955 Amy Blauer signed a broad release in return for the $18,000 paid in settlement of her claim. It released from liability, *inter alia,* "the organization, group, governmental body or agency which furnished the drug" that caused Blauer's death. If valid under New York law, this release clearly would free the United States from liability in this case.

A release may, however, be set aside under New York law if induced by fraud. *Barrett v. United States,* 622 F.Supp. 574, 584 (S.D.N.Y.1985); *Goldsmith v. National Container Corp.,* 287 N.Y. 438, 443, 40 N.E.2d 242 (Ct.App.1942). To show fraud, plaintiff must have proven that:

1) there was a misrepresentation or active and wrongful concealment of a material fact;

2) the representation was in fact false and was known to be false at the time it was made or the concealment was intentional;

3) the misrepresentation was made for the purpose of inducing plaintiff to rely on it or the concealment was done to mislead the plaintiff;

4) plaintiff did, in fact, rely on the misrepresentation or would have acted differ-

ently had she known of the concealment; and

5) plaintiff was caused injury as a proximate result of the misrepresentation or concealment.

*Barrett v. United States,* 622 F.Supp. at 584; *Mallis v. Banker's Trust Co.,* 615 F.2d 68, 81 (2d Cir.1980), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981). The United States is bound by the fraudulent actions of its agents or co-conspirators. *Ferrainolo v. Prudential Ins. Co.,* 197 N.Y.S.2d 36, 38 (Sup.Ct.1960), *modified on other grounds,* 12 A.D.2d 720, 208 N.Y.S.2d 136 (4th Dep't.1960); *see also* cases collected in 19 N.Y.Jur.2d 461, notes 97–99 (1982).

Plaintiff has proven each of these elements by a clear preponderance of the evidence. *See George Backer Management Corp. v. Acme Quilting Co., Inc.,* 46 N.Y.2d 211, 413 N.Y.S.2d 135, 139, 385 N.E.2d 1062, 1066 (Ct.App.1978); *Simcuski v. Saeli,* 44 N.Y.2d 442, 453, 406 N.Y.S.2d 259, 265, 377 N.E.2d 713, 719 (Ct.App.1978).

The major misrepresentation made to the plaintiff was that Blauer's injection was given for diagnostic and therapeutic purposes rather than solely for experimental purposes. The Estate was told this consistently, from the time it learned of Blauer's death until the day the release was signed. This misrepresentation appeared in the Institute's report to the Medical Examiner, in the Medical Examiner's report, and in the Institute's medical records supplied to the Estate in connection with the litigation. In addition, Dr. Hoch repeated it at the proceeding at which the release was confirmed by the Court of Claims. The Estate did not learn that the injection was given solely as part of an experiment until 1975.

The fact that Blauer was given the injection of EA 1298 for purely experimental purposes, rather than for his own benefit, certainly would have been material in a decision whether to settle the Estate's

---

**7.** The jury, which also heard the evidence presented to this court, was presented with a similar statute of limitations claim regarding defendants Cattell and Bigelow. Their finding, of course, is not binding on this court, and the court announced at trial that it would not accept the jury's findings even as an advisory verdict. However, it is comforting to note that six jurors came to the same conclusion as this court.

claim and for how much. The misrepresentation was calculated to make the Estate settle its claim quickly, so that it would not stumble onto the Army's role in Blauer's death and so that the the truth would not be exposed at trial. The evidence shows clearly that the Estate reasonably relied on this misrepresentation in signing the release, and was injured by settling for a lower amount than it probably would have been awarded had it known the true circumstances of Blauer's death.

In addition, the State of New York, at the direction of the United States, concealed documents that should have been turned over to the Estate because of the Court of Claims' order. These documents would have exposed the Army's involvement and the true cause of Blauer's death. The United States took at least some of these documents out of New York State and instructed Marcus to stall the Estate and not to turn them over. This was done to prevent the Estate from learning of the Army's involvement. The fact that Blauer had died in an Army chemical warfare experiment clearly would have been material to the Estate in its settlement decisions. The Estate was injured because this fact was concealed.

The United States cannot hide behind the fact that some of the information it concealed was classified. The fact that Blauer was not given the injection for diagnostic or therapeutic purposes was not classified. Also, several of the documents removed from New York and concealed from the Estate were not classified.

■ More importantly, however, simply because certain information is classified does not justify United States employees in covering up the *existence* of that informa-

tion. *United States v. Reynolds,* 345 U.S. 1, 9–10, 73 S.Ct. 528, 532–533, 97 L.Ed.2d 727, 734 (1953) ("Judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers.").

If the Army did not want to reveal certain information surrounding Blauer's death because of classification, the proper course of action would have been to make a formal claim of privilege when the information was requested.[8] The court would then have been in a position to assess the Government's claim, and the plaintiff would have been in a position to oppose it. The Army was not, however, justified in actively misleading the Estate so that it would never have reason to investigate the Army's involvement.

Thus, Amy Blauer's release of the supplier of the drug in 1955 does not bar the plaintiff's recovery from the United States in this action because the release was obtained by fraud.[9]

The Government has placed one final twist in its release argument. New York General Obligations Law Sec. 15–108 provided in 1955 that the release of one of several joint-tortfeasors, without reserving any claim against the others, released all. *Rushford v. United States,* 204 F.2d 831, 832 (2d Cir.1953); *Jordan v. Westhill Central School District,* 42 A.D.2d 1043, 1044, 348 N.Y.S.2d 620, 621 (4th Dep't.1973). On December 15, 1986, a jury found that Dr. Cattell and Dr. Bigelow had been released by the plaintiff in 1955 and that they therefore were not liable in this lawsuit. The Government contends that Sec. 15–108 requires the court to find that Amy Blauer's 1955 release of Dr. Cattell and Dr. Bigelow operates to release all other tortfeasors, including the United States.

**8.** General William Creasy, former Chief of the Army Chemical Corps, suggested a superior alternative at trial. He said he thought the best solution would have been to obtain security clearance for members of Blauer's family so that they could have been told the true facts surrounding his death.

**9.** After the trial of this case, the jury found that the 1955 release was valid with respect to both Dr. Cattell and Dr. Bigelow. The jury's finding is not inconsistent with the court's finding that

the release does not bar this suit against the Government. As the jury was instructed, a release can be valid with respect to one tortfeasor and not with respect to another. A release is invalid only as to those who knew of or participated in the alleged misrepresentations or fraudulent conduct. *Taxin v. Food Fair Stores, Inc.,* 287 F.2d 448, 450 (3rd Cir.1961); *Martina Theatre Corp. v. Schine Chain Theatres, Inc.,* 278 F.2d 798, 802 (2d Cir.1960).

■ This argument has no merit. The cases the Government cites in support of this proposition are easily distinguished from the one presented here. In those cases, the tortfeasors claiming benefit of the releases had not concealed their identities or the true nature of the plaintiff's cause of action, as the Government has in this case. *See Rushford v. United States,* 204 F.2d at 832 (2d Cir.1953); *Jordan v. Westhill Central School District,* 42 A.D.2d at 1044, 348 N.Y.S.2d at 621 (4th Dep't.1973). Sec. 15–108 must be read equitably within the context of the common law principles governing the setting aside of releases for fraud. In this context it is clear that the Government cannot in any way claim benefit of the 1955 release, which it obtained fraudulently.

### 3. Collateral Estoppel

Federal courts must give to a final judgment of a state court the same preclusive effect the judgment would be given in the state in which the judgment was rendered. 28 U.S.C. Sec. 1738; *Migra v. Warren City School Dist. Bd. of Ed.,* 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56, 61 (1984). State law governs the preclusive effect to be given such a judgment. *Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 375, 105 S.Ct. 1327, 1329, 84 L.Ed.2d 274, 278 (1985).

In 1955, proceedings were held before the New York Court of Claims and a judgment was rendered that awarded Blauer's estate $18,000 for its wrongful death claim against New York State. The United States contends that this judgment collaterally estops plaintiff from relitigating the amount of damages for Harold Blauer's wrongful death in this case. Giving the 1955 judgment this preclusive effect would, in effect, bar this action, or at least make it useless.

Before the doctrine of collateral estoppel may be applied to preclude a party from litigating a particular question, strict requirements must be met "to insure that a party not be precluded from obtaining at least one full hearing" on the question. *Gramatan Home Investors Corp. v. Lo-*

*pez,* 46 N.Y.2d 481, 485, 414 N.Y.S.2d 308, 311, 386 N.E.2d 1328, 1331 (Ct.App.1979). One of these requirements is that there have been a clear determination on the merits of the "point actually to be determined in the second action." *Ryan v. New York Telephone Co.,* 62 N.Y.2d 494, 501, 478 N.Y.S.2d 823, 826, 467 N.E.2d 487, 490 (Ct.App.1984); *see also Gramatan Home Investors Corp. v. Lopez,* 46 N.Y.2d at 486, 414 N.Y.S.2d at 311, 386 N.E.2d at 1332. The Government has not met this requirement with respect to the $18,000 judgment rendered in 1955.

The Court of Claims in 1955 did not make a determination on the merits of the appropriate measure of damages for Harold Blauer's wrongful death, nor did it attempt to do so. The purpose of the proceeding was simply to approve the settlement that had been negotiated between the Estate and New York. In fact, the Court of Claims judgment, itself, states that the $18,000 award was "in full *settlement*" of the Estate's claim.

Although Amy Blauer did provide some testimony regarding damages at the Court of Claims hearing, the court did not use this evidence to calculate damages. This is clear because the court simply adopted a figure that the parties had decided upon in advance of the hearing. It seems, rather, that this evidence was required to be given so that the Court of Claims Judge could assure himself that the settlement figure was justified, and that the State was not being cheated. There is no evidence that the court's adjustment of the settlement figure from the $15,000 originally agreed upon to the final $18,000 figure was an attempt to arrive at a figure that would compensate the Estate fully for its damages.

■ The parties' settlement figure cannot be taken as a true measure of the Estate's wrongful death damages. An amount to which a plaintiff will agree in settlement is generally discounted by the likelihood of success and the expected cost of litigation. In fact, George Leonard, a Justice Department lawyer involved in the cover-up, estimated that the Estate's claim

would be worth much more than $18,000 if the case were to go to trial and the full attendant circumstances revealed to the court. Again, it is clear that the $18,000 judgment of the Court of Claims was not, nor was it intended to be, a final disposition on the merits of the question of the Estate's wrongful death damages. Thus, this court cannot give the 1955 judgment collateral estoppel effect to preclude plaintiff from proving higher damages in this proceeding.

The United States advances one further argument in support of its claim that plaintiff's lawsuit is precluded. After Elizabeth Barrett learned of the Army's involvement in her father's death, she moved, pursuant to New York C.P.L.R. Sec. 3102, for an order permitting discovery in anticipation of bringing a second suit against New York State in the Court of Claims.[10] This motion was denied because the Court of Claims found that Barrett had not stated a new cause of action against the State of New York. *See Barrett v. State of New York,* 85 Misc.2d 456, 378 N.Y.S.2d 946, 952 (Ct.Cl.1976). The United States points to this 1976 decision in its collateral estoppel argument.

■ The Government has apparently abandoned its contention that this decision has any *direct* res judicata or collateral estoppel preclusive effect in this action. *See* United States' Supplemental Memorandum of Law at 7 (April 13, 1987). Indeed, this decision could have no such effect, because it was not a final judgment on the merits. *See In Re Teltronics Services, Inc.,* 762 F.2d 185, 190 (2d Cir.1985). The court specifically stated that it was denying Barrett's motion "without prejudice." *Barrett v. State of New York,* 85 Misc.2d 456, 378 N.Y.S.2d at 952. The Government argues, however, that this 1976 decision provides an authoritative statement of the way in which a New York court would rule regarding the preclusive effect of the 1955 decision in this action.

A prior New York decision may certainly be instructive as to the preclusive effect a New York court would give to a particular New York judgment. *See Gargiul v. Tompkins,* 790 F.2d 265, 271 n. 7 (2d Cir. 1986). However, this is true only if the State court was presented with the same question of preclusion that the federal court must decide. In 1976, the Court of Claims was faced with a very limited question. It ruled only that Barrett could not have discovery against the State of New York in the Court of Claims based on the allegations she presented to the court. This is quite different from the question of whether the 1955 judgment precludes relitigation of damages for the claims currently presented against the United States.

The United States is in a very different position from that which the State of New York would be in as a defendant in a suit such as this one. The State was the defendant in the 1955 action, and the Estate was aware of many elements of its claim against the State at that time. In fact, the Court of Claims judge noted that the Assistant State Attorney General's argument on the motion, which the judge ultimately accepted, was based on the position that "[Blauer's] hospital records could only be utilized against the Department of Army or in a forum other than this one." *Barrett v. State,* 85 Misc.2d 456, 378 N.Y.S.2d 946, 949 (Ct.Cl.1976).

Therefore, the 1976 Court of Claims judgment does not even provide persuasive evidence of how a New York court would rule on the question of the collateral estoppel effect of the 1955 judgment on damage determination in the present suit against the United States. According to the law of New York, the 1955 judgment can have no such effect.

In sum, this court cannot equitably allow the United States the benefit of any of the three affirmative defenses it claims. Each of the defenses is initially available only because of a fraud the Government perpetrated on the plaintiff. To allow the

10. Elizabeth Barrett brought this motion for discovery in her individual capacity and not as administratrix of the Blauer Estate.

Government to escape liability because of one of these defenses would deny justice to the plaintiff and, in effect, sanction the Government's wrongdoing. It is, therefore, appropriate to turn to an assessment of the Government's liability.

### B. Liability

Under the doctrine of Sovereign Immunity, the Government cannot be sued absent an express waiver of immunity. *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953–954, 47 L.Ed.2d 114 (1976); *Lambertson v. United States*, 528 F.2d 441, 443 (2d Cir.), *cert. denied*, 426 U.S. 921, 96 S.Ct. 2627, 49 L.Ed.2d 374 (1976). Plaintiff brings this action under the Federal Tort Claims Act (FTCA), 28 U.S.C. Sections 1346(b), 2671–80, which waives immunity for certain types of suits. Title 28 U.S.C. Sec. 1346(b) grants federal district courts exclusive jurisdiction to hear

> civil actions on claims against the United States, for money damages ... for ... death caused by the negligent or wrongful act or omission of any employee of the Government ... under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

There are, however, certain exceptions to this general grant of the right to sue the Government in tort. The United States has not waived sovereign immunity for these exceptions, so "federal courts are without subject matter jurisdiction to entertain a suit based on them." *Lambertson v. United States*, 528 F.2d at 443. These exceptions limit the type of acts for which the United States may be held liable. Two exceptions of particular relevance in this case are the discretionary function exception and the independent contractor exception. The application of these to this case is discussed below.

### 1. The Discretionary Function Exception

The discretionary function exception is set forth in 28 U.S.C. Sec. 2680 as follows:

> The provisions of this chapter and Sec. 1346(b) of this title shall not apply to—
> (a) Any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved is abused.

The exception flows from the principle of separation of powers. The underlying rationale for the principle is that the Government's policy-making should not be second-guessed by the judiciary through the imposition of tort liability. *Begay v. United States*, 768 F.2d 1059, 1063 (9th Cir.1985); *Jayvee Brand, Inc. v. United States*, 721 F.2d 385, 392 (D.C.Cir.1983); *Beins v. United States*, 695 F.2d 591, 600 (D.C.Cir. 1982); *Caban v. United States*, 671 F.2d 1230, 1233 (2d Cir.1982). *Payton v. United States*, 636 F.2d 132, 143 (5th Cir.1981); *Glickman v. United States*, 626 F.Supp. 171, 174 (S.D.N.Y.1985).

The Supreme Court recently stated that the planning and institution of Government programs fall within the discretionary function exception. *See United States v. S.A. Empresa de Viacao Aerea Rio Grandense, (Varig Airlines)*, 467 U.S. 797, 811, 104 S.Ct. 2755, 2763, 81 L.Ed.2d 660, 673 (1984) *citing with approval Dalehite v. United States*, 346 U.S. 15, 35–36, 73 S.Ct. 956, 967–968, 97 L.Ed. 1427 (1953). The Second Circuit has described discretionary functions as "activities that require the alleged tortfeasor to consider and weigh competing policies in arriving at his decision...." *Caban v. United States*, 671 F.2d at 1233.

In a case strikingly similar to this one, the Ninth Circuit affirmed the dismissal of a suit for a wrongful death that allegedly occurred as a result of a simulated biological warfare attack on the City of San Francisco in 1953. *See Nevin v. United States*, 696 F.2d 1229 (1983), *cert. denied*, 464 U.S. 815, 104 S.Ct. 70, 78 L.Ed.2d 84 (1983). The court noted that the allegedly negligent decision regarding what strain of bacteria to use in the simulation was made by

the Chief of the Army Chemical Corps, himself, and that in making that decision, General McAuliffe had to weigh numerous factors, including concerns for national security, a need for secrecy, the possible risks of urban testing, and applicable medical concerns.

*Nevin v. United States*, 696 F.2d at 1231.

■ Likewise, the decision to test potential chemical warfare agents on human subjects at the Psychiatric Institute, while perhaps disturbing, involved weighing these same policy factors. The court thus lacks FTCA jurisdiction to review the Government's planning, initiation, and funding of its chemical warfare testing program and its decision to choose the Psychiatric Institute as its contractor, since these were all discretionary functions. *United States v. Varig Airlines*, 467 U.S. at 811, 104 S.Ct. at 2763, 81 L.Ed.2d at 673; *Caban v. United States*, 671 F.2d at 1233.

## 2. The Independent Contractor Exception

The FTCA does not permit imposition of liability on the United States for acts of its independent contractors. *United States v. Orleans*, 425 U.S. 807, 814, 96 S.Ct. 1971, 1976, 48 L.Ed.2d 390, 397–98 (1976). FTCA jurisdiction is limited to the wrongful act or omission of any "employee of the Government." 28 U.S.C. Sec. 1346(b). The Act defines "employee of the Government" to include "officers or employees of any federal agency," but the definition of "federal agency" specifically excludes "any contractor with the United States." 28 U.S.C. Sec. 2671.

A critical element distinguishing a federal agency from a contractor is the power of the Government "to control the detailed physical performance of the contractor." *United States v. Orleans*, 425 U.S. at 814, 96 S.Ct. at 1976, 48 L.Ed.2d at 398, *quoting Logue v. United States*, 412 U.S. 521, 528, 93 S.Ct. 2215, 2219, 37 L.Ed.2d 121 (1973). The Second Circuit has described the required level of control as "supervising the day-to-day operations" of the contractor. *Falls Riverway Realty v. Niagara Falls*, 754 F.2d 49, 57 (1985).

Plaintiff contends that the level of control that the Chemical Corps exercised over the Psychiatric Institute under the chemical testing contract removes the Institute from the category of contractor. In support of this assertion, plaintiff points to the following provisions in the contract. The Chemical Corps had the power to terminate the contract, to audit, to approve the Institute supervisor, and to require security clearance for those working on the contract. It required quarterly reports from the Institute, and none of the results of the experiments could be made public without the Army's permission. The Corps was responsible for supplying the chemicals and performing toxicity tests on them, as well as for supplying the equipment with which the Institute's study was to be performed. The Corps also reserved the right to all patents that might have been developed in the research, and required compliance with provisions regarding the "Eight-Hour Law of 1912," "Convict Labor," and "Nondiscrimination in Employment."

These provisions do not amount to day-to-day supervision over the conduct of the experiments. *See Lipka v. United States*, 369 F.2d 288, 291 (2d Cir.1966), *cert. denied*, 387 U.S. 935, 87 S.Ct. 2061, 18 L.Ed.2d 997 (1967) (holding the United States not liable for negligent acts of its contractor despite the Army Corps of Engineers' contractual power to control the contractor's compliance with contract specifications, including safety specifications); *see also Kropp v. Douglas Aircraft Co.*, 329 F.Supp. 447 (E.D.N.Y.1971) (reservation of rights in contract are not enough to make a contractor the United States' employee under the FTCA; the United States must actually direct the details of performance to be liable.)

■ In fact, it is clear that responsibility for the day-to-day operation of the testing program was vested not in the Chemical Corps but solely in the Institute. This is obvious from both the words of the contract and the testimony at trial regarding the way in which the testing program was designed to operate. As noted earlier, the section of the contract titled "Supervision"

explicitly vested this responsibility in specific Institute doctors. The Institute was responsible for designing its own protocols and procedures for performing the tests and for doing all of the actual work of injecting the patients and recording the results. It was never intended that the Chemical Corps interfere with the Institute's procedures, and, in fact, it did not.

The Institute, therefore, must be considered a contractor under the FTCA, and the actions of its personnel may not be imputed to the United States for the purpose of imposing liability.

### 3. The United States' Negligence

As the discussion above shows, plaintiff's negligence claim is squeezed between two statutory limitations: the discretionary function exception and the independent contractor exception. The Government cannot be held liable for the planning and design of the chemical warfare testing experiment because of the discretionary function exception. At the same time, the alleged negligence of the Institute's doctors in carrying out the experiments may not be attributed to the Government for the purpose of imposing liability because of the independent contractor exception.

■ However, plaintiff has one route to navigate between the discretionary function Scylla and the independent contractor Charybdis. The United States may be held liable for its toxicity testing under the FTCA. The toxicity testing was performed by Chemical Corps doctors, not by an independent contractor. To the extent that there was a "policy" regarding the toxicity testing, it was that it be done correctly to insure the safety of the human beings to whom the chemicals would be administered. Thus, as the Government conceded at trial, neither the independent contractor exception nor the discretionary function exception is a bar to imposition of liability for negligence in performing the toxicity testing.

As the discussion in section IIB of this opinion makes clear, the Army was grossly negligent in deriving the LD–50 in mice of EA 1298, the chemical that killed Blauer.

The Chemical Corps found doses at which all mice are killed and at which no mice are killed, but never found the mid-range doses that are absolutely necessary to determine a valid LD–50. As the Government's own expert witness all but admitted in court, the Chemical Corp's data gave virtually no scientific basis for the conclusion that the LD–50 of EA 1298 was 20 to 80 mg/kg, as the Chemical Corps reported to the Institute. The raw data that the Chemical Corps reported to the Institute were also of very little use in determining proper doses for human beings.

Despite this, the Army sent the chemical with the inadequate LD–50 study to the Psychiatric Institute, knowing that the chemical would be injected into human beings without further animal toxicity testing. The Government had a duty to Blauer to test the chemical adequately before sending it to the Psychiatric Institute, and it breached this duty. Harold Blauer died because he was given too much of this chemical. A reasonable person would have tested the chemicals adequately.

Of course, for the United States to be held liable in this case, the plaintiff must prove not only that the toxicity testing was negligently performed, but also that this negligence was the proximate cause of Blauer's death. *Derdiarian v. Felix Contracting Corp.,* 51 N.Y.2d 308, 314–15, 434 N.Y.S.2d 166, 169, 414 N.E.2d 666, 670 (Ct.App.1980). The United States makes a clever but unpersuasive argument that the Chemical Corps' negligence was not the proximate cause of Blauer's death. The Government claims that, according to the standards of the early 1950's, the Chemical Corps' duty to perform toxicity tests was met by performing such tests only on mice. It contends further that the Chemical Corps' toxicity data were "accurate," in that they were consistent with the LD–50 for mice found by the University of Michigan. Therefore, the Government reasons, even if the Chemical Corps did not perform the toxicity tests properly, this negligence was not the proximate cause of Blauer's death.

Although it is a close question of fact, the court agrees with the Government that plaintiff has not met its burden of proving that in the 1950's the mere fact that toxicity tests were performed only on mice constituted negligence *per se*. It is also true that the Army's LD–50 was consistent with that reported by the University of Michigan study in that the LD–50 of 57.7 mg/kg in the University's study fell within the range of 20 to 80 mg/kg that the Chemical Corps reported to the Psychiatric Institute.

There is, however, a clear flaw in the Government's reasoning. Simply because two reported LD–50's are technically consistent with each other in a mathematical sense does not mean they are equally useful in determining safe human doses. An exact figure for an LD–50 is much more useful than a broad range of 20 to 80 mg/kg. The Army could have obtained such an exact figure if it had performed the toxicity tests correctly. More importantly, however, in the hands of a professional psychopharmachologist, such as Dr. Hoch, the information to be obtained from an LD–50 study goes far beyond the final number reported. As discussed above, the experimental data behind the Army's LD–50 were virtually useless. An LD–50 study that is done properly, such as that performed by the University of Michigan, yields not only a final LD–50 figure but also raw data helpful to a psychopharmachologist in determining doses for human beings.

If the Chemical Corps had not been negligent in performing its LD–50 tests on mice, then the information it could have provided the Institute would have been sufficient for Dr. Hoch to know that the dose of 6.47 mg/kg of EA 1298 that killed Harold Blauer was dangerously high. Therefore, the Chemical Corps' negligence in performing the toxicity tests was a proximate cause of Blauer's death.

The FTCA imposes liability "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. Sec. 1346(b). Clearly if a drug company, for example, had contracted with a mental hospital to test an experimental drug, the company had supplied the hospital with inadequate toxicity tests, and a patient had died of an overdose of the drug as a result, the drug company would be liable under New York law for the wrongful death. The result can be no different here, and the United States must be held liable in damages for the wrongful death of Harold Blauer.

## C. Damages

The FTCA requires a federal court to award damages in accordance with state law, subject to certain limitations that the Act imposes. *Hatahley v. United States*, 351 U.S. 173, 182, 76 S.Ct. 745, 752, 100 L.Ed. 1065, 1074 (1956); *see also* 28 U.S.C. Sec. 2674. Section 5–4.3 of the New York Estate, Powers and Trusts Law (EPTL) governs the calculation of the Estate's damages for Blauer's wrongful death. Blauer's estate may also recover damages for his conscious pain and suffering proximately caused by the Government's negligence. *See Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 53 (2d Cir. 1984).

Damages for wrongful death should give "fair and just compensation for the pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is brought." N.Y. EPTL Sec. 5–4.3. Wrongful death damages "are exclusively for the benefit of the decedent's distributees...." EPTL Sec. 5–4.4(a). New York law defines "distributee" as "a person entitled to take or share in the property of a decedent under the statutes governing descent and distribution." EPTL Sec. 1–2.5. Thus no award may be given for losses that Amy Blauer might have suffered, since she and Blauer were divorced before his death. The Estate's only distributees under New York law are his two daughters, Elizabeth and Belinda.

 Under New York law, the Estate may recover for (1) loss of support and voluntary assistance to Elizabeth and Belinda, (2) loss of the daughters' potential inheritance, (3) their loss of parental guid-

ance and nurture, (4) reasonable funeral expenses, and (5) Blauer's conscious pain and suffering. *Parilis v. Feinstein*, 49 N.Y.2d 984, 985, 429 N.Y.S.2d 165, 166, 406 N.E.2d 1059, 1060 (Ct.App.1980). These components of the Estate's damages are discussed below.

### 1. Lost Support, Voluntary Assistance, and Potential Inheritance

Damages for lost support and voluntary assistance are most easily analyzed in conjunction with damages for lost potential inheritance. An infinite variety of human characteristics, family situations, and other factors may be relevant to a court's determination of these damages. However, New York courts have commonly considered the following to be important: the decedent's age, health, financial expectations, earning ability, and income, as well as the number, age, and situation of those dependent on him for support, and the manner in which he would have supported them. *See Morgan Guaranty Trust Co. v. Texasgulf Aviation*, 604 F.Supp. 699, 700 (S.D.N.Y.1985) and cases cited therein.

Harold Blauer was 42 years old when he died. For years prior to his death, Blauer was a ranking tennis professional. He taught tennis at two exclusive country clubs. In the winter he taught at the River Club in New York and in the summer he taught at the Piping Rock Club. In addition to his teaching responsibilities, Blauer ran pro shops at the clubs, from which he also derived income.

Many of the records that probably would have given a more accurate picture of Blauer's income have been lost over the years during which this cause of action was concealed from the plaintiff. However, the available credible evidence indicates that Blauer was earning approximately $15,000 per year at the time of his death.

If Blauer had not died, he would have returned to his former jobs at the tennis clubs or to similar jobs elsewhere that would have afforded him a similar income. Blauer's psychiatric problems were not permanent. If he had not died, he would have been released soon from the Psychiatric Institute, without any disability that would have prevented him from working.

Blauer married Amy Fierman in 1935. They had their first child, Elizabeth, on November 9, 1939, and their second, Belinda, on March 8, 1942. Harold and Amy Blauer separated in August of 1951 and became divorced in August of 1952. Pursuant to the separation agreement and divorce decree, Harold Blauer obtained custody of Elizabeth, and Amy Blauer obtained custody of Belinda. The separation agreement and divorce decree also provided that Blauer was obligated to pay Amy Blauer one-third of his income in alimony until her death or remarriage and one-sixth of his income in child support for Belinda during her minority. Amy Blauer remarried in 1959 or 1960.

Duly qualified economic experts for both plaintiff and the United States testified at trial regarding the daughters' lost support and inheritance. The economists used a commonly-accepted methodology, the basic idea of which is to subtract Blauer's expected personal expenditures from his projected income during his lifetime. The result is a sum available for Blauer either to spend on the support of his daughters or save and leave to his daughters as inheritance.

Both economists performed a portion of their calculations using the assumption that Blauer's income at the time he died was $15,000 per year, an assumption the court accepts. However, as is too often the case, the two economists came to widely differing conclusions. The calculations of the Government's expert yielded a result of $50,606, while the calculations of plaintiff's expert yielded a result of over one million dollars. Their differences are largely attributable to three factors, which are as follows.

First, the Government's expert adjusted Blauer's projected disposable income to take income taxes into account, while the plaintiff's expert did not.

Second, the Government's expert, relying on statistical tables, assumed that Blauer's worklife would end at age 61 and that he

would live until age 69. She, therefore, subtracted $49,450 from her calculation of the amount Blauer would have saved to account for his personal consumption between the ages of 61 and 69, during which time she assumed he would have no income. In contrast, the plaintiff's expert assumed that Blauer would live until the age of 70 and work full-time until he died. Plaintiff's expert did not use statistical tables but simply relied on assumptions that plaintiff's lawyers had given him.

Third, the plaintiff's expert adjusted his intermediate finding of the proper measure of damages to take account of the time value of money.[11] The adjustment was made using the rate for three-month U.S. Treasury Bills during that period. The Government's expert made no such adjustment. These three factors account almost entirely for the difference between the two economists' calculations.[12]

#### a. Taxes

As for the first factor, the FTCA requires that income taxes be subtracted from gross income in the calculation of damages. See Shaw v. United States, 741 F.2d 1202, 1206 (9th Cir.1984); Flannery v. United States, 718 F.2d 108, 111 (4th Cir. 1983), cert. denied, 467 U.S. 1226, 104 S.Ct. 2679, 81 L.Ed.2d 874 (1984); Harden v. United States, 688 F.2d 1025, 1029 (5th Cir.1982); O'Connor v. United States, 269 F.2d 578, 584 (2d Cir.1959); but see, Kalavity v. United States, 584 F.2d 809, 813 (6th Cir.1978); See generally, Annot., 47 ALR Fed. 735, et seq.

 If Blauer had lived, he would have paid taxes on his income, which would have

decreased the amount available to his daughters. For this court to make an award that was not decreased to take taxes into account would be contrary to the compensatory nature of the Federal Tort Claims Act. See O'Connor v. United States, 269 F.2d at 584. It would also be unfair to the Government. See Fanetti v. Hellenic Lines Ltd., 678 F.2d 424, 431 (2d Cir.1982), cert. denied 463 U.S. 1206, 103 S.Ct. 3535, 77 L.Ed.2d 1387 (1983) (holding that it would be unfair to the defendant if expected taxes were not subtracted from an award in an LHWCA case, and that taxes must be subtracted from claims for future wages based solely on federal law because of "strong federal policies of fairness and efficiency in litigation of federal claims").

Taxes must be subtracted even though, as a general rule, the FTCA requires a federal court to follow state law in determining damages, see Hatahley v. United States, 351 U.S. at 182, 76 S.Ct. at 752, 100 L.Ed. at 1074 (1956); see also 28 U.S.C. Sec. 2674, and New York law does not permit the consideration of evidence of expected income taxes in the calculation of wrongful death damages. Woodling v. Garrett Corporation, 813 F.2d 543 (2d Cir. 1987).

The Government's tax expert performed his calculations in a reasonable manner given the information available. The Government's economic expert was correct in taking these tax calculations into account in her determination of damages, and the analysis of plaintiff's economic expert was flawed by his failure to do so.

---

11. A fourth difference between the Government's and the plaintiff's economic testimony is that the Government's expert properly assumed Blauer would begin to earn an income again in 1953. Although plaintiff argued at trial that Blauer would have been discharged from the Psychiatric Institute and begun earning an income again in 1953 if he had not died, plaintiff's expert did not begin projecting income until 1955, perhaps with the date of the 1955 Court of Claims judgment in mind. The court finds, as the Government assumed, that Blauer would have begun working and earning income again in 1953. Of course, this increases plaintiff's award.

12. According to plaintiff's expert, his million-dollar projection is reduced to $184,675 when expressed in 1955 dollars. Subtracting $74,917 for the Government's estimate of income taxes yields $109,758. Subtracting $49,450 for the Government's estimate of Blauer's consumption from age 61 to age 69 yields $60,308. The Government's projection was $50,606. The $9,702 difference is easily explained by plaintiff's faulty assumption that Blauer would earn a full-time annual income until the age of 70.

#### b. Work-Life Expectancy

As for the second factor of difference, plaintiff presented no evidence to lead the court to believe that Blauer would have lived beyond his statistical life expectancy to the age of 70. It is also extremely unlikely that Blauer would have worked full-time until the day he died. Plaintiff's economic calculations are, therefore, flawed because they are based on the assumption that Blauer would continue earning a full-time income until the age of 70.

On the other hand, the court does not accept the Government's contention that Blauer would have had no income between the ages of 61 and 69, and therefore would have drained his savings of $49,450 for consumption during that period. The Government took no account of income from social security. Also, plaintiff has shown by a preponderance of the evidence that, as a tennis pro, Blauer would have been able to earn some income after the age of 61 by giving tennis lessons. It is reasonable, therefore, to assume that Blauer's income between the age of 61 and his death would have been sufficient to offset his consumption. Thus the court finds that Blauer would have continued to earn a full-time income only until the age of 61, but would have had sufficient income to support himself between that age and his death. For this reason, $49,450 must be added back into the Government's calculations to make them consistent with the court's factual findings.

#### c. Compensation for the Time Value of Money

The third difference between the two economists' damage calculations is that plaintiff's expert adjusted his calculations to take account of the time value of money, while the Government's expert did not. Plaintiff's expert made this adjustment using the historical rate for six-month United States Treasury Bills. Thus plaintiff's economist has expressed his final suggested award in 1986 dollars. The Government's expert's suggested award is simply the sum of the calculated losses for each year in which a loss occurred, with no adjustment for the time value of money.[13] This third factor accounts for the largest part of the difference between the two experts' proposed awards.

Plaintiff argues that the adjustment for the time value of money is appropriate, since plaintiff was denied the use of this money for many years by the Government's wrongful cover-up. If plaintiff had had use of the money during the period of the cover-up, it could have invested the amount conservatively in six-month Treasury Bills. In addition, the Government gained from having the use of the money during this period, and it should not benefit from its wrongful acts.

While plaintiff's argument carries some theoretical and equitable force, it cannot prevail because of the express limitation Congress has placed on awards against the United States under the Federal Tort Claims Act. Section 2674 of the Act prohibits the award of pre-judgment interest. Plaintiff's request that its award be adjusted for the time value of money is, in effect, no more than an attempt at an end run around this express prohibition.

New York law normally compensates those in plaintiff's position for loss of the time value of money by awarding pre-judgment interest "upon the principal sum recovered by the plaintiff from the date of decedent's death." *See* N.Y. EPTL 5–4.-3(a). This pre-judgment interest is the functional equivalent of compensation for the time value of money. *See Library of Congress v. Shaw,* 478 U.S. ——, 106 S.Ct. 2957, 2965, 92 L.Ed.2d 250, 260 (1986). As the Supreme Court recently stated, "the force of the no-interest rule cannot be avoided simply by devising a new name for an old institution." *Id.*

Whether the adjustment plaintiff requests is called pre-judgment interest,

---

**13.** The Government's expert did take account of the general increase in wages over time in her projection of Blauer's wages, as she should have. *See O'Rourke v. Eastern Air Lines, Inc.,* 730 F.2d 842, 857 (2d Cir.1984). This is not to be confused with the adjustment for the time value of money that plaintiff's expert suggests.

"compensation for the time value of money," or "compensation for delay," it cannot be allowed because of the express prohibition in Section 2674 of the Act. While the application of Section 2674 may work an injustice in this case, particularly because of the long period during which plaintiff has been deprived of its money because of the Government's wrong, this is an injustice for Congress, not this court, to correct.

For the above reasons, the court finds plaintiff's economic testimony to be seriously flawed because of problems in both factual assumptions and legal interpretations. The economic analysis that the Government presented is in accord with the legal requirements of both the FTCA and New York law. In addition, the factual assumptions on which it is based are in accord with the court's factual findings, with the one exception noted above, which can easily be corrected.

The court therefore adopts the Government's economic analysis, with one exception, as follows. It finds that Blauer earned $15,000 in 1952, would have returned to work in January of 1953, would have received annual increases in earnings in an amount tracking increases in the Consumer Price Index, would not have remarried, and would have worked full-time for his expected work-life and supported himself from the time he finished work until his death on some combination of social security and part-time work. Under these assumptions his income would have been $341,178, his alimony payments would have been $36,461, his expected child support for Belinda would have been $29,688, his expected personal consumption for the rest of his life would have been $100,056, and his expected accumulated federal income tax liability payable for the remainder of his working life would have been $74,917.

■ Based on these facts, the amount Blauer would have made available for either his daughters' support or their inheritance would have been the $50,606 suggested by the Government's expert plus $49,450 that the Government's expert incorrectly subtracted to take account of consumption between Blauer's retirement and his death,

or $100,056. To this figure must be added the $29,688 calculated as the required legal child support for Belinda. The Estate's total damages for the daughters' loss of support and inheritance are, therefore, $129,744.

### 2. Parental Nurture and Guidance

■ Under the New York wrongful death statute, plaintiff may recover for the loss to Blauer's daughters of his parental guidance, training, advice, nurture, and care. *Juiditta v. Bethlehem Steel Corp.*, 75 A.D.2d 126, 428 N.Y.S.2d 535, at 543 (4th Dep't 1980); *Zaninovich v. American Airlines, Inc.*, 26 A.D.2d 155, 271 N.Y.S.2d 866, at 873 (1st Dept.1966). Such losses are recognized as part of pecuniary losses to the daughters during their minority, and are distinct from non-compensable injuries to affections or sentiments. *Rogow v. United States*, 173 F.Supp. 547, 561 (S.D. N.Y.1959).

The evidence presented at trial shows that Blauer was a kind man, a good teacher, and a devoted father. Pursuant to Blauer's divorce decree, Belinda was in the custody of her mother, while Elizabeth was in the custody of her father. However, there was substantial testimony about Blauer's close relationship with both of his daughters and the guidance he gave them. In particular, education was very important to Blauer. After Blauer's death, both girls were placed in school in Mexico, where their educational opportunities were limited.

In addition, as a tennis pro at exclusive country clubs, Blauer lived among extremely wealthy and influential people. His daughters were exposed to this culture and became part of it through their father. Such exposure, had it continued, would have had a major positive influence on the daughters' economic status.

The evidence shows that Elizabeth, in particular, was very close to her father and undoubtedly suffered a great deal from the loss of his guidance. Elizabeth testified about her relationship with her father and the way in which his absence affected her. The court takes judicial notice of the fact

that it was quite unusual for a father to take custody of a young girl in the 1950's when the mother was capable of doing so. This is strong corroboration of Elizabeth's close relationship with her father.

█ After her father's death, Elizabeth's life fell apart emotionally, socially, and educationally. Although she came from an educated family, she did not finish high school at the time she should have and was unable to obtain a college degree. Her working career has suffered accordingly. Although Elizabeth's problems cannot be attributed entirely to her father's death, it is undoubtedly true that the death contributed significantly to them and changed the course of her life. With this in mind, the court awards $70,000 for the loss of Blauer's parental nurture and guidance to Elizabeth.

█ The court's award for loss of parental nurture and guidance to Belinda must be limited, because she was in her mother's custody at the time of Blauer's death. However, the evidence shows that she would have benefited substantially from Blauer's guidance had he not died. In particular, the evidence shows that her educational opportunities would have been greater. Therefore, the court awards $20,000 for loss of parental nurture and guidance to Belinda.

*3. Funeral Expenses*

█ The uncontroverted evidence presented to this court shows that the reasonable expenses of Harold Blauer's funeral amounted to $300. These are properly part of the court's award. *Parilis v. Feinstein,* 49 N.Y.2d at 985, 429 N.Y.S.2d at 166, 406 N.E.2d at 1060.

*4. Pain and Suffering*

Plaintiff claims damages for Blauer's conscious pain and suffering during the entire 28 days of the chemical study. This would include suffering caused not only by the fifth and final chemical injection that killed Blauer, but also by the four prior chemical injections.

However, plaintiff has not met her burden of proving that the Government's negligence was the proximate cause of the pain and suffering occasioned by the first four injections. As discussed earlier, the Government cannot be held liable simply for deciding to have the experiments performed or contracting for them to be carried out.

The first injection was of the same chemical, EA 1298, that eventually killed Blauer. However, the injection was of a relatively small and evidently safe dose. The injection caused no compensable pain or suffering.

The second, third, and fourth injections were all of chemicals other than EA 1298. Plaintiff has not produced sufficient evidence for the court to find that the Government's negligence was the proximate cause of any pain and suffering Blauer might have experienced as a result of the injection of these chemicals. The award for pain and suffering must, therefore, be limited to Blauer's conscious pain and suffering resulting from the fifth injection on January 8, 1953.

Under New York law, plaintiff may be compensated for pain and suffering only during the time that Blauer was conscious. *Spadaccini v. Dolan,* 63 A.D.2d 110, 407 N.Y.S.2d 840, 847–48 (1st Dep't 1978); *Jones v. City of New York,* 57 A.D.2d 429, 395 N.Y.S.2d 10, 12 (1st Dep't 1977). As noted earlier, Blauer was conscious for about one and one-half hours before he lapsed into a coma.

The drug study notes—though limited to physiological observation—give graphic evidence of the pain and suffering Blauer experienced before his death. In part, they read as follows:

| | |
|---|---|
| 9:53 A.M. | injection started—legs being moved |
| 9:55 | "i.v.'s getting me now"—restless movement—protesting injection. |
| 9:57 | injection ended. |
| 9:59 | very restless—has to be restrained by nurse—out of contact wild flailing of arms. Sweating profusely |
| 10:01 | patient pulled up in bed—generalized stiffening of body. respirations sterterous [sic] 32/min. |

pulse 120/min
teeth clenched—frothing at mouth.
rapid oscillation (latent) of eyeballs.

10:04 neck position suggests opisthotonos
10:05 extremities held rigidly
pupils moderately dialated and do not respond to light
corneal reflex intact.

10:09 generalized flushing of face and chest—profuse sweating continued
generalized tremor of lower extremities. frothing at mouth.
cyanotic

10:10 continued sterterous [sic] respirations—28/min irregular
jaw tightly clenched. rigid.

10:11 generalized rigidity—tonic—neck, arms, legs.

\* \* \* \* \* \*

11:05 Some rigidity with restlessness.
random movements of arms and legs.
Talking with frequent references to "Murphy"; mostly incoherent but questionable contact at times.

11:12 increasing restlessness.
Intermittently generalized rigidity.

\* \* \* \* \* \*

11:17 No longer talking. Lapsing into coma. Still restless....

11:30 becoming cyanotic. respiration rapid and sterterous [sic]....

11:45 Quiet. Deep coma....

\* \* \* \* \* \*

From this evidence, the court finds that Blauer suffered extreme physical pain because of the fifth injection.

Plaintiff's recovery is not limited, however, to physical pain. It may also recover for the mental distress Blauer suffered under the influence of the chemical. *See Birnbaum v. United States*, 588 F.2d 319, 335 (2d Cir.1978); *Kernall v. United States*, 558 F.Supp. 280, 286 (E.D.N.Y. 1982), aff'd, 729 F.2d 1444 (2d Cir.1983). EA 1298 was a hallucinogen. The Army was interested in the compound as a potential "discombobulator" of enemy populations. The court has had substantial testimony about the effect of this chemical on the mind. Blauer was suffering from anxiety and other mental problems at the time he was given the chemical. He was given the chemical in a sterile, unfriendly atmosphere against his will, and was not adequately warned of its effects. It is clear that Blauer must have suffered tremendous mental distress under the influence of this hallucinogenic chemical.

■ With the foregoing facts in mind, the court awards $500,000 in compensatory damages for Blauer's pain and suffering, both physical and mental, as a result of the fifth injection.

### 5. *Apportionment*

Plaintiff released Drs. Schnack, Lewis, Brill, and Michael of the Psychiatric Institute from liability in 1977. *See Barrett v. United States*, 651 F.Supp. 611, 613 (S.D. N.Y.1986). This release was given after plaintiff was aware of the facts surrounding Blauer's death. Under New York General Obligations Law Sec. 15-108(a), the United States's liability in this action must be reduced by the proportionate share of wrongdoing of these released joint tortfeasors. *Id.* at 613; *See also Driscoll v. New York City Transit Authority*, 53 A.D.2d 391, 385 N.Y.S.2d 540, 543 (1st Dep't 1976).

■ There was very little evidence presented at trial regarding the involvement of these doctors in Blauer's death. From this evidence, however, the court must conclude that the planning of, and even knowlege about, the chemical experiment that killed Blauer was limited almost exclusively to Drs. Cattell and Bigelow among the Institute personnel. The court therefore finds that Drs. Schnack, Lewis, Brill, and Michael should be apportioned none of the liability for Blauer's death.

### 6. *Return of the $18,000 Settlement Award*

Plaintiff stated during trial that, in order to try its cause of action against the United States and the other defendants, it was rescinding the 1955 release pursuant to which it was paid $18,000 by the State of New York. Accordingly, this amount must be subtracted from plaintiff's final award. *See Woodling v. Garrett Corporation*, 813 F.2d 543, 561 (2d Cir.1987).

The Second Circuit stated recently that interest must normally be paid for the period during which a party has held such settlement money prior to rescinding the settlement. *Id.* However, the Govern-

ment does not seek such interest, because plaintiff is not entitled to pre-judgment interest in this case under the Federal Tort Claims Act. *See* United States' Supplemental Memorandum of Law at 13.

Plaintiff contends that only one-half, or $9,000, of the $18,000 settlement payment should be set off against its award, since the United States paid only one-half of the settlement. Plaintiff ignores, however, the compensatory nature of the Federal Tort Claims Act. If only $9,000 were set off against plaintiff's award, then plaintiff would gain a double recovery of the $9,000 that was not set off. Because plaintiff has rescinded the release, she must disgourge the fruits of her bargain to the full extent. *Woodling*, at 561. Therefore, the full $18,000 must be set off.

### 7. Summary and Calculation of Damages

The court's determination of damages is as follows:

| | |
|---|---|
| Lost Support and Inheritance | $129,744 |
| Lost Parental Nurture and Guidance | |
| Elizabeth | 70,000 |
| Belinda | 20,000 |
| Funeral Expenses | 300 |
| Pain and Suffering | 500,000 |
| minus $18,000 Settlement | − 18,000 |
| Total Award | $702,044 |

## CONCLUSION

The United States negligently caused the death of Harold Blauer in 1953 and therefore is liable to his Estate for his wrongful death. Plaintiff's damages in this action are $702,044 for which the United States is liable in full. The United States cannot be held liable for attorney's fees. *Ruckelshaus EPA v. Sierra Club*, 463 U.S. 680, 683–84, 103 S.Ct. 3274, 3277, 77 L.Ed.2d 938, 942–43 (1983); *Johnson v. United States*, 780 F.2d 902, 910 (11th Cir. 1986).